DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Goodyear Tire Rubber Company ("Goodyear"), appeals from a decision in the Summit County Court of Common Pleas that entered judgment in favor of Appellee, Rondy, Inc. ("Rondy"). We affirm.
 i. {¶ 2} On May 24, 2001, Rondy filed a complaint against Goodyear, alleging breach of settlement. Goodyear moved for summary judgment; the trial court denied this motion. Thereafter, Goodyear answered and counterclaimed. A jury trial followed. At the close of Rondy's case and at the close of all of the evidence, Goodyear moved for a directed verdict. The trial court denied Goodyear's motion in both instances. The jury found in favor of Rondy, and it awarded Rondy $356,555.00. Goodyear then moved for a judgment notwithstanding the verdict ("JNOV") or, in the alternative, moved for a new trial on the issue of damages. Before the trial court ruled on this motion, Goodyear appealed to this Court. The trial court subsequently denied Goodyear's motion for a JNOV and its motion for a new trial. Goodyear moved for leave to file an amended notice of appeal. This Court granted the motion.
 ii. {¶ 3} Goodyear timely appeals and raises three assignments of error for review. To facilitate review, we will address assignments of error one and two together.
 a. First Assignment of Error
"The jury's finding that goodyear breached the settlement agreement was not supported by sufficient evidence and the trial court incorrectly denied Goodyear's motion for a directed verdict at the close of Rondy's case and at the close of all the evidence."
 Second Assignment of Error
"The jury's finding that rondy sustained lost profits of $356,555 was not supported by sufficient evidence and the trial court incorrectly denied Goodyear's motion for judgment notwithstanding the verdict[.]"
 {¶ 4} In its first assignment of error, Goodyear asserts that Rondy did not introduce sufficient evidence to demonstrate that Goodyear had breached the settlement agreement. As such, Goodyear asserts that the jury's verdict was not supported by sufficient evidence and, accordingly, the trial court erred when it denied its motions for a directed verdict. In its second assignment of error, Goodyear asserts that the trial court erroneously denied its motion for a JNOV. Particularly, Goodyear asserts that Rondy failed to present sufficient evidence to demonstrate its entitlement to lost profits. We disagree.
 {¶ 5} When reviewing the propriety of a trial court's decision regarding a JNOV, an appellate court employs the standard of review applicable to a motion for a directed verdict.Posin v. A.B.C. Motor Court Hotel, Inc. (1976),45 Ohio St.2d 271, 275. An appellate court reviews a trial court's ruling on a motion for a directed verdict de novo, as it presents an appellate court with a question of law. Schafer v. RMS Realty
(2000), 138 Ohio App.3d 244, 257, citing Nichols v. Hanzel
(1996), 110 Ohio App.3d 591, 599. A motion for a directed verdict assesses the sufficiency of the evidence, not the weight of the evidence or the credibility of the witnesses. Strother v.Hutchinson (1981), 67 Ohio St.2d 282, 284, citing Durham v.Warner Elevator Mfg. Co. (1956), 166 Ohio St. 31, 36; Ruta v.Breckenridge-Remy Co. (1982), 69 Ohio St.2d 66, 68, citingRohde v. Farmer (1970), 23 Ohio St.2d 82, 91.
 {¶ 6} In accordance with Civ.R. 50(A)(4), a directed verdict is properly granted when "the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party[.]" Furthermore, if the party opposing the motion for a directed verdict fails to produce any evidence on one or more of the essential elements of a claim, a directed verdict is appropriate. Hargrove v. Tanner (1990), 66 Ohio App.3d 693,695. Conversely, the motion must be denied where substantial evidence exists upon which reasonable minds may reach different conclusions. Posin, 45 Ohio St.2d at 275.
 {¶ 7} Settlement agreements are considered contracts, and, appropriately, the law of contracts governs their interpretation.D'Angelo v. Allstate Ins. Co. (Mar. 31, 1993), 11th Dist. No. 92-L-095, citing Diamond v. Davis Bakery, Inc. (1966),8 Ohio St.2d 38, 44; Huffy Corp. v. MRED Properties (Nov. 23, 1993), 3rd Dist. Nos. 10-93-8, 10-93-9, 10-93-10, 10-93-12, 10-93-13, and 10-93-14. The party seeking to enforce the settlement agreement bears the burden to prove, by a preponderance of the evidence, all of the elements of a claim for breach of a settlement agreement. See Cooper Pachell v. Haslage (2001),142 Ohio App.3d 704, 707, quoting AMF, Inc. v. Mravec (1981),2 Ohio App.3d 29, paragraph two of the syllabus. "Those elements include the existence of a [settlement agreement], performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." Doner v. Snapp (1994), 98 Ohio App.3d 597, 600. A plaintiff may recover lost profits in a breach of settlement agreement, if he demonstrates that "(1) [the] profits were within the contemplation of the parties at the time the [settlement agreement] was made, (2) the loss of profits is the probable result of the breach of [settlement agreement], and (3) the profits are not remote and speculative and may be shown with reasonable certainty." Mihalich v. Heyden, 9th Dist. Nos. 21318 and 21321, 2003-Ohio-2848, at ¶ 10, quoting Charles R. CombsTrucking, Inc. v. Internatl. Harvester Co. (1984),12 Ohio St.3d 241, paragraph two of the syllabus. The plaintiff must demonstrate the amount and existence of lost profits with "reasonable certainty." Mihalich at ¶ 10, quoting Gahanna v.Eastgate Properties, Inc. (1988), 36 Ohio St.3d 65, syllabus. Furthermore, the plaintiff need only present reasonable, not specific, evidence of lost profits. Charles R. Combs Trucking,Inc., 12 Ohio St.3d at 244.
 {¶ 8} At trial, Barbara McLaren ("McLaren"), an employee of Rondy, testified regarding her job responsibilities at Rondy; specifically, she stated that she oversees the purchasing of raw materials and transporting materials, and that she serves as the sales person for the company. McLaren then testified that Rondy had contracted with Goodyear; however, a dispute arose between the companies. She remarked that the companies settled their dispute via a settlement agreement. McLaren explained that the settlement agreement provided that Goodyear would permit Rondy to bid on materials, and if Rondy offered the highest bid, Goodyear would award it the contract. The settlement agreement, in pertinent part, reads:
"B. Future Business Relationship.
"1. Within 30 days of the date of this Settlement Agreement, Goodyear shall notify its plants of the terms of this Settlement Agreement and that Rondy is a bidder and vendor in good standing and shall require its plants to place Rondy on their list of potential bidders for their accumulations of scrap material. Goodyear shall thereafter provide Rondy's Sales Department * * * with its requests to bid from all of Goodyear's Canadian and United States facilities for accumulations of scrap material.
"2. Rondy may bid in a timely manner on accumulations of scrap material offered in response to any request for bids issued by Goodyear in accordance with the terms of the request for bids. With respect to any request for bids issued by Goodyear, in the event Rondy's bid is the highest, Rondy will be awarded the contract subject to the conditions set forth below, except that in the event that there is a tie for the highest bid, Goodyear shall have the unilateral right to award the contract to any entity which offered one of the highest tied bids.
"* * *
"4. At its own expense, Rondy will have the right to audit Goodyear's bid process through an independent auditor approved by Goodyear, which approval shall not be unreasonably withheld, to determine whether it was the highest bidder. If Rondy desires such an audit, Rondy shall provide written notice via certified mail requesting the same * * *. The independent auditor retained by Rondy shall keep confidential to Goodyear the amounts of all bids and the identity of all bidders, and shall not disclose such information to Rondy. Goodyear at its discretion may require the independent auditor to sign a written confidentiality agreement prior to Goodyear's disclosing any confidential information to the independent auditor."
 {¶ 9} McLaren testified that she received a call from Dennis Skurka ("Skurka")[1] and, from him, she learned that Goodyear had rubber buffings available for bid at its Wingfoot Commercial Plant Tire Systems[2] ("Wingfoot"), located in Brunswick, Ohio, in the fall of 1999. McLaren further testified that Skurka asked if Rondy would be interested in purchasing the rubber buffings; McLaren remarked that Rondy would be interested in purchasing the rubber buffings because it did not have a sufficient supply of rubber buffings to satisfy its demand She stated that she asked Skurka for contact names and numbers at additional Wingfoot facilities that could also sell rubber buffings. McLaren related that she contacted three facilities, and they agreed that they would also "like to deal with Rondy." She testified that she was instructed to contact Brent Copeland ("Copeland") by the contact individuals at these facilities and Skurka. McLaren then explained that she contacted Copeland and told him that she would give him five cents per pound for the rubber buffings from the four facilities, and he requested that information in writing and asked if Rondy would be interested in a "national contract." She stated that she told Copeland that Rondy was only interested in the four facilities, and that Copeland subsequently requested Rondy to bid on the four facilities. McLaren testified that she learned that Goodyear awarded the contract to another company and that company had only bid two and one-half cents per pound; she also learned that Copeland was not aware of the settlement agreement between Rondy and Goodyear. McLaren testified that despite Rondy's ability to purchase rubber buffings from other companies, it still did not have enough to satisfy its demand Finally, McLaren discussed the lost profits Rondy incurred as a result of Goodyear's failure to award it the contract and explained how the figure was derived; she stated that the lost profits figure equaled $356,555.00.
 {¶ 10} Brian Cummings ("Cummings"), a certified public accountant, testified that he previously worked as the corporate controller for a large tire distributor and re-tread manufacturer. He then stated that he was asked to "render an opinion" regarding the lost profits Rondy incurred from Goodyear's failure to award it the contract. Cummings explained the process to determine lost profits, and provided a detailed description of the process, from determining the cost of materials, labor, packaging, and overhead to the selling price of the product. He further explained that he examined various financial statements to determine whether Rondy did sustain a loss. Lastly, he concluded that Rondy sustained a loss of profits equaling $356,555.00.
 {¶ 11} Donald Rondy ("Donald"), the president of Rondy, testified that the settlement agreement concerned Rondy, Goodyear, and Goodyear's associates, affiliates, and subsidiaries. He then testified that Rondy bid five cents per pound for the rubber buffings, and that he believed Rondy was the highest bidder. Donald asserted that when he learned that Rondy was not awarded the contract, he made a written demand for an audit. Donald declared that Goodyear denied his demand for an audit, claiming that the product "wasn't up for bid." He maintained that Rondy was unable to meet the demands of its customers because it was short of materials. He concluded that Rondy incurred damages for the length of time it could not obtain rubber buffings from the four plants, and that the amount of damages totaled "$356,000 and change."
 {¶ 12} Copeland testified that he was the vice-president of manufacturing at Goodyear, and that his role involved the sale of rubber buffings. He stated that he received a call from Skurka, indicating that he should expect a telephone call from McLaren. Copeland then stated that McLaren called and expressed her interest in the rubber buffings from the four plants. He related that McLaren offered five cents per pound; however, he maintained that her offer was not in response to a request for a bid. Copeland added that McLaren stated that Rondy could not enter a nationwide contract. He asserted that Goodyear entered into a national contract with a company that bid two and one-half cents per pound for the rubber buffings. Copeland acknowledged that he was unaware of the settlement agreement between Rondy and Goodyear, and that he was required to award Rondy the contract if it was the highest bidder.
 {¶ 13} Lastly, Carole Wendt, a director of purchasing at Goodyear, admitted that she did not notify "any of the retail, retread facilities, or anybody at Wingfoot Commercial Tire Systems" about the settlement agreement.
 {¶ 14} Based on the foregoing, we hold, that, construing the evidence in a light most favorable to Rondy, a reasonable jury could conclude that Goodyear breached the settlement agreement and Rondy lost profits as a result of the breach. Therefore, we conclude that the trial court appropriately denied Goodyear's motions for directed verdict, claiming Rondy failed to present sufficient evidence to demonstrate that Goodyear had breached the settlement agreement, and its JNOV regarding Rondy's lost profits claim. Accordingly, Goodyear's first and second assignments of error are overruled.
 B. Third Assignment of Error
"The trial court incorrectly received [Rondy's] exhibit 23 into evidence."
 {¶ 15} In its third assignment of error, Goodyear contends that the trial court improperly permitted Rondy to admit Exhibit 23 into evidence because (1) Exhibit 23 constituted hearsay; and (2) Rondy failed to lay a proper foundation when introducing this exhibit. We disagree with Goodyear's contention.
 {¶ 16} We begin our discussion with Goodyear's contention that Exhibit 23 constituted hearsay. However, we find that we need not address whether this exhibit amounted to hearsay. Assuming arguendo that Exhibit 23 was hearsay, we do not see how its admission into evidence amounted to reversible error. At most, it was harmless error. See In re Reeves (June 7, 2000), 9th Dist. Nos. 19650, 19669, 19672, 19673, 19674, 19705, 19706, and 19707 (concluding that errors in the admission of hearsay are generally harmless when the evidence is cumulative in nature), citing In re Hubbard (Oct. 7, 1991), 2nd Dist. Nos. CA90-05-081, CA90-05-082, and CA90-05-083; McDermott v.McDermott, 6th Dist. No. F-02-023, 2003-Ohio-2361, at ¶ 22.
Civ.R. 61 provides:
"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." See, also, Siuda v. Howard, 1st Dist. Nos. C-000656 and C-000687, 2002-Ohio-2292, at ¶ 21, citing Meyers v. HotBagel Factory, Inc. (1999), 131 Ohio App.3d 82, 100-101 (stating that "harmless error is an error that does not affect the substantial rights of the parties").
 {¶ 17} "`In determining whether a substantial right of a party has been affected, the reviewing court must decide whether the trier of fact would have reached the same decision, had the error not occurred.'" Prakash v. Copley Twp., 9th Dist. No. 21057, 2003-Ohio-642, quoting Moore v. Univ. of Akron (Aug. 1, 2001), 9th Dist. No. 20320.
 {¶ 18} In the instant case, Goodyear has failed to demonstrate how the admission of Exhibit 23 has affected its substantial rights. See Civ.R. 61; Siuda at ¶ 21. Rondy submitted additional evidence beyond this exhibit to illustrate the lost profits that stemmed from the breach of the settlement agreement. Any error in the admission of this exhibit was harmless. See In re Reeves, supra; McDermott at ¶ 22; In reHubbard, supra. Consequently, in light of the other evidence presented at trial, we conclude that Exhibit 23 could not have affected the substantial rights of Goodyear. See Rome RockAssoc., Inc. v. Warsing (Dec. 17, 1999), 11th Dist. No. 98-A-0051 (concluding that the appellant was not prejudiced by an alleged hearsay affidavit, as other evidence existed; therefore, any error was harmless).
 {¶ 19} We now turn to Goodyear's contention that Rondy failed to lay a proper foundation when introducing Exhibit 23.
 {¶ 20} This Court notes that Goodyear has failed to set forth legal authority to support its contention that the trial court erred in admitting Exhibit 23 on the basis that Rondy failed to lay proper foundation. Thus, Goodyear's presentation of this argument runs afoul of App.R. 16(A)(7) and Loc.R. 7(A)(6). As the appellant in this case, Goodyear had the burden of affirmatively demonstrating the error on appeal. See Angle v. W. Res. Mut.Ins. Co. (Sept. 16, 1998), 9th Dist. No. 2729-M; Frecska v.Frecska (Oct. 1, 1997), 9th Dist. No. 96CA0086. Accordingly, since Goodyear has failed to set forth any legal error by the trial court to support its contention that Rondy failed to lay a proper foundation, this Court must disregard it.
 {¶ 21} Therefore, Goodyear's third assignment of error is overruled.
 III. {¶ 22} Goodyear's assignments of error are overruled. The decision of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
Baird, P.J., Slaby, J., Concur.
[1] Dennis Skurka worked for Goodyear at its re-tread facility in Brunswick, Ohio.
[2] Wingfoot Commercial Tire Systems is a subsidiary of Goodyear.